IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JUNE K. BAUGHMAN,** | : | |
| **Plaintiff** | : | **Civil No. 1:13-CV-1511** |
| | : | |
| **v.** | : | |
| | : | |
| **CHEUNG ENTERPRUSES, LLC,** | : | |
| **d/b/a MCDONALDS,** | : | |
| **Defendant** | : | **Judge Sylvia H. Rambo** |

**M E M O R A N D U M**

In this employment discrimination action, Plaintiff, a former employee of Defendant, alleged that she was discriminated against because of her age and disability when her employment was terminated, which she contends was in violation of both the Age Discrimination in Employment Act and the Pennsylvania Human Relations Act.  Presently before the court is Defendant's motion for summary judgment (Doc. 22), wherein Defendant contends that Plaintiff can neither  establish that she had a covered disability nor that the legitimate non-discriminatory basis for her termination was a pretext.  For the following reasons, Defendant's motion will be granted in part and denied in part.

I.       <u>Background</u>

The claims in this case are based largely upon the events underlying Defendant's decision to terminate Plaintiff's employment, which was supposedly based upon Plaintiff's poor performance.  The following facts are undisputed or, where disputed, reflect Plaintiff's version of facts in the record, pursuant to this court's duty to view all facts and reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

A.    **Facts**

Plaintiff, June Baughman, who at all times relevant to this litigation was a member of the class of individuals protected against age-based discrimination in the workplace, became employed as a crew trainer by Defendant, Cheung Enterprises,[1] in 2005 after Defendant assumed ownership of the McDonald's restaurant located on the Harrisburg Pike in Middletown, within the Middle District of Pennsylvania. (Doc. 24, ¶¶ 5-7.) Plaintiff was employed in this capacity until her employment was terminated on April 2, 2012. (*See id.* at ¶¶ 51, 52.) In addition to her responsibility to act as a resource for newly hired employees, Plaintiff washed dishes and assembled much of the food sold at the McDonald's restaurant including hamburgers, sandwiches, salads, and parfaits. (Doc. 26-1, pp. 18-19 of 183.) These tasks required Plaintiff to stand and lift certain items, including boxes of frozen burger patties. (*Id.* at pp. 19-20 of 183; *see also* Doc. 24, ¶¶ 8-9.) Plaintiff had been able to perform the functions of her job at the time Defendant took control of the restaurant. (*See* Doc. 24, ¶ 11.) Plaintiff preferred to work the overnight shift, which was typically from 11:00 p.m. until 7:00 a.m. (*See* Doc. 26-1, pp. 23, 27 of 183.) The overnight shift was comprised of one manager and two crew members. (Doc. 26-1, p. 27 of 183.)

In 2008, Plaintiff slipped in the freezer and broke her wrist while at work. (Doc. 24, ¶ 10; Doc. 26-1, pp. 20-21 of 183.) While Plaintiff was recovering, another employee worked the night shift. (Doc. 24, ¶ 12.) Once Plaintiff returned to work, she was able to fully use her wrist and resumed working close to forty hours per week. (*Id.* at ¶¶ 13-14.) Plaintiff also suffered from arthritis in her knee throughout her employment with Defendant, which prohibited her from easily

---

[1] Defendant is a limited liability corporation that operated multiple McDonald's fast-food franchises in the Harrisburg area and was co-owned by Andrew and Dorothy Cheung. (Doc. 24, ¶¶ 1-2.)

traversing stairs at the restaurant; however, she testified that it was easy to request help from another employee when she needed to go into the basement to get supplies.  (Doc. 26-1, pp. 24-25 of 183.)  In July 2010, Plaintiff underwent knee replacement surgery, for which she was in recovery until November 2010.  (*Id.* at pp. 25-26 of 183.)  Plaintiff resumed her position on the overnight shift following her surgery, albeit she was working between sixteen and thirty hours per week due to another employee being in the same position.  (*Id.* at p. 31 of 183; Doc. 24, ¶ 23.)  Plaintiff, although still unable to traverse steps immediately following the surgery, testified that she never had difficulty getting assistance and was eventually able to walk up and down the stairs.  (*Id.* at pp. 28, 31 of 183.)[2]  Indeed, Plaintiff admitted in her deposition that she was able to physically perform the essential functions of her job as crew trainer.  (Doc. 26-1, pp. 31, 65-66, 105 of 183.)[3]

---

[2]  During her deposition, Plaintiff clarified the limitations with her ability to traverse steps:

Q:  Now, during that time period – again, let's use the time frame of between November 2010 up until February or March of 2012.  Other than the steps and the heavy boxes, were you fully able to do your job duties?

A:  Yes.  *It wasn't long after that I could do the steps too*.

Q:  Okay.  So when were you able to go up and down the steps?

A:  That I don't remember.  *I know it was like a couple weeks*.

(Doc. 26-1, p. 31 of 183 (emphasis supplied).)

[3]  In her answer to Defendant's statement of material facts, Plaintiff disputes that she was able to perform the essential functions of her job, citing her difficulty with being on her knees.  (*See* Doc. 27, ¶ 16 (citing Doc. 26-1, pp. 105, 124 of 183.)  Plaintiff's assertion in this regard is belied by her own deposition testimony.  Specifically, Plaintiff testified as follows regarding her physical limitations:

A:  . . . .  The only thing I can't do physically is get on my knees.  Other than that, I can do everything else.

Q:  And you don't have to do that as a crew person, right?

A:  No.

Q:  Or as a crew trainer, right?

A:  No.  When I clean under the tables, I find other ways.

(continued...)

Dora Matei ("Matei") became manager of the McDonald's restaurant in October 2011. (Doc. 24, ¶ 25.) Soon after Matei became manager, she met with staff to discuss store needs and employee performance, which included reports that the overnight shift was not fulfilling its cleaning and restocking duties. (*Id.* at ¶ 26; Doc. 26-3, p. 11 of 40.) Specifically, Matei testified as follows regarding managers' reports of Plaintiff's performance issues, which she initially hesitated to act upon:

> [W]henever I went to the store, the store wasn't ready. It wasn't clean. It wasn't stocked. So, I used to go into the managers and demand an explanation like why the job wasn't done, why wasn't it clean, you know. We're dealing with food, we're dealing with people, food safety.
>
> And they will say to me that, you know, sometimes it was because [Plaintiff] couldn't finish the job or couldn't do it fast enough and they had to come and help her out or, you know, be in the kitchen while she was doing something else until she was done.

(Doc. 26-3, pp. 11, 13 of 40.) Andrew Cheung ("Mr. Cheung"), a co-owner of Cheung Enterprises, acknowledged that "speed is a criteria that some of the older

---

(...continued)
(Doc. 26-1, p. 105 of 183.) Furthermore, Plaintiff unequivocally testified that she was able to physically perform the job duties required of someone on the day shift:

> Q:   Did [your responsibilities on day shift] require you to be standing the whole time?
>
> A:   Sure. Yes.
>
> Q:   You were physically able to do that?
>
> A:   Yes.
>
> Q:   Was there any part of your job on day shift that you were not physically able to do?
>
> A:   No.

(*Id.* at pp. 65-66 of 183.) Plaintiff's averment that she was unable to bend down (*see* Doc. 27, ¶ 24 ("It is disputed that [Plaintiff] was able to physically perform all aspects of her job duties as subsequent to her knee replacement surgery. . . .") is unsupported by the record and is therefore resolved in favor of Defendant. To the extent Plaintiff had difficulty putting her full body weight on her knees, the court interprets her testimony as indicating that she did not need to do so for purposes of her job.

employees cannot keep up," which he acknowledged is "one of the drawback[s] of . . . having older employees on the employment." (Doc. 26-5, p. 9 of 34.) Matei did not understand Plaintiff's inability to complete her duties because the overnight shift was generally less busy than the weekday shift. (*See* Doc. 26-3, p. 15 of 40.) This prompted Matei to give Plaintiff a verbal performance warning and move Plaintiff from the overnight shift to the morning weekend shift. (*See* Doc. 26-1, p. 84 of 183; Doc. 26-3, p. 14 of 40.) Matei recounted a meeting during which she told Plaintiff of the shift change:

> I told her that I was going to put her in the morning, that maybe it would be better for her to work the morning shift like weekends like Friday, Saturday[,] and Sunday 6 to 1 or 6 to 2. You know, that way it would be better for her because of all of the complaints that she couldn't do this or she couldn't do that.
>
> And I was like, okay, so then let's make it easier for her then if it's too much for her then we tried to help her out. And that's when I told her, you know, we're going to put you in the morning. All you have to do is just come in at 6, from 6 to 10 do salads, parfaits, burritos, and then go on your break, come back, do the dishes and all that, make sure everything is clean, you know, prep, pull the next day breakfast stuff out ready for the next day and do some fries and that's it and then after that you go home. And if we need you in overnight one day or two days, we will put you in.

(Doc. 26-3, p. 14 of 40.) Matei testified as follows regarding her rationale for the scheduling move:

> [T]hings wasn't getting done. Cleaning wise it wasn't getting done. And for a store that was just finishing an FOR, a business review, where like once a year, once every two years they will go and have like a little inspection to see how the store looks inside, outside cleaning wise.

> They check the service times and the service in the kitchen, how friendly we are, and we get an average. It's either 100 or you got 80 percent. And you have to have like 80 or above, something like that, to pass. If not, then they have to go back again and do it.
>
> So for a store that already had one and they did good, you know, the store shouldn't be the way it was, you know, getting dirty and filthy.

(*Id.* at p. 15 of 40.)

Unfortunately, the evidence of record demonstrates that this schedule change failed to correct the problems Matei attributed to Plaintiff's performance. In this regard, Matei testified as follows regarding her observations of Plaintiff following the scheduling change:

> Even though [Plaintiff] was switched from overnight to morning, she still – like she did okay in the beginning. So I was like, okay, maybe we did the right thing and we made the right choice. But then after a little bit she was like slacking a little bit.
>
> *   *   *
>
> She would mess up the salads or put the wrong cheese in the wrong salad or make burritos without cheese or put too much parfait like yogurt, or she would go in there and do dishes and dishes wasn't done right. It wasn't clean. It was always messy. She would go in fries and it would still be messy.
>
> Like she couldn't do it, like she couldn't keep up. We constantly had to like tell her like, come on, [Plaintiff], are you okay? Can you keep up? You need help? . . . . And she should have done that on her own. And the managers was like I can't work with her.

(*Id.* at p. 17 of 40.)   Matei testified that she told Plaintiff that her employment would be terminated if her performance did not improve.  (*Id.* at p. 17 of 40.)  Plaintiff testified that she never received any written warning for her performance, and

Plaintiff disputes each issue deemed unsatisfactory on her performance review, although she admittedly never challenged or expressed any disagreement with her "below standards" ratings.  (Doc. 26-1, pp. 66-67 of 183; Doc. 24, ¶ 40.)

Plaintiff testified that she heard from Ester Beher, a manager at the McDonald's, that there was a "hit list" of five or six of the older employees that Defendant directed Matei to "get rid of."  (Doc. 26-1, p. 55 of 183.)  Plaintiff testified that she heard that she was included on this list.  (*Id.* at p. 56 of 183.)  At the time of Plaintiff's deposition, at least four of those allegedly included on the hit list were no longer employed by Defendant.  (*Id.* at p. 56 of 183.)

Plaintiff's unsatisfactory performance was brought up during a meeting with several managers regarding the restaurant's needs for improvement, and several other managers voiced concerns similar to those of Matei.  (Doc. 26-3, p. 18 of 40.[4])  Based on Plaintiff's failure to improve, Matei decided that Plaintiff needed to be disciplined in the form of being suspended.  (*Id.* at p. 18 of 40.)  Matei removed Plaintiff from the work schedule for the week of April 2 - April 8, 2012.  (Doc. 24, ¶ 46.)  Matei prepared an Employee Action Form which outlined the basis for Plaintiff's suspension as follows:

> [Plaintiff] has been suspended for not finishing her job[.]
> This is not the first time that happen[ed] and I already
> when [sic] over her responsabilitys [sic] and she is still

---

[4]  Matei recalled as follows regarding the managers' meeting:

Q:   What specifically was discussed about [Plaintiff]'s employment at this meeting with the managers?

A:   If she was able to do the job, if she was able to perform, if she was following procedures, if she was using her gloves, if she wasn't touching the food with her hand, or she was cleaning and she was getting things done right.  Because the dishes that she was cleaning they were dishes that people use, reuse.  So, you know, bacteria grows and there's a health food safety violation.

(Doc. 26-3, p. 18 of 40.)

> doesnt get it[.] She doesnt follow persecures [sic] and not
> following direccion [sic] and we [are] not going to keep
> taking that from her anymore.

(Doc. 26-4, p. 31 of 36.)  Subsequently, Matei discussed her plan to suspend Plaintiff

with Eric Whatmore ("Whatmore"), the assistant manager at the restaurant, to which

he suggested that Matei terminate rather than suspend Plaintiff's employment.  (Doc.

26-3, pp. 18-19 of 40[5]; *see also* Doc. 24, ¶ 54.)  Plaintiff saw that she was removed

from the schedule when she arrived at the McDonald's on March 31, 2012, and was

told by Whatmore to speak with Matei.  (Doc. 24, ¶¶ 49, 50; *see also* Doc. 26-1, pp.

85-88 of 183.)

Plaintiff specifically points to the details of her meeting with Matei

during which her employment was terminated as evidence tending to establish that

her employment was terminated for a discriminatory reason.  Plaintiff met with

Matei and Whatmore at approximately 2:00 p.m. on April 2, 2012, at which time

Plaintiff was informed that her employment was terminated due, in part, to Plaintiff's

inability to multitask.  (Doc. 24, ¶ 53; Doc. 26-1, pp. 90-91 of 183.)  Plaintiff's

recollection of this conversation was less than complete but confirmed that Matei

stated her opinion that Plaintiff was not performing her job.  (Doc. 26-1, p. 92 of

183.)  Although Plaintiff testified that she did not agree with Matei's assessment, she

admitted that she did not argue or challenge Matei on this point.  (*Id.* at p. 92 of 183.)

Plaintiff testified that she could not point to an instance where Matei fabricated an

---

[5]  Matei recalled her conversation with Whatmore as follows:

I talked to Eric and Eric was saying, listen, you know, we've been giving her too
many opportunities already and she still doesn't improve.  She's going [sic]
worse and, you know, she's not doing things right, you know, and I think she
should go, it's time to let her go.  And I was like, well, is that how you feel then,
okay.  So, then we just terminate her.

(Doc. 26-3, p. 18 of 40.)

issue with Plaintiff's performance.  (*Id.* at p. 84 of 183.)  Rather, Plaintiff explained

that she was not reaching the performance levels set by Matei.  (*Id.* at p. 85 of 183.)

Sometime between April 2, 2012 and April 6, 2012, Matei authored an

Employee Action Form that documented the April 2, 2012 meeting.  (Doc. 24, ¶ 57.)

The Employee Action Form explained as follows:

> On April 2, 20012 [sic] [Plaintiff] was terminated by the
> store manager do [sic] to her poor performance.  She spoke
> with her and splained [sic] to her the reason why she was
> been [sic] let go[.] [Plaintiff] understood and agree[d] with
> what she was telling her and also knows that because of her
> age and health essue [sic] she cant [sic] perform that job
> with 100% anymore[.] [Plaintiff] is a wonderfull [sic]
> employee and I was very glad working with her but she
> cant [sic] keep up anymore and she also agree[d] with it
> and that it was time for her to go.

(Doc. 26-1, p. 141 of 183 ("Original EAF").)   Plaintiff testified that "[her age or

health] came up because [Matei] told [her that she] should retire and take it easy like

[Matei's] grandmother."  (*Id.* at p. 102 of 183.)  Although she did not know

Plaintiff's exact age (Doc. 26-3, p. 21 of 40), Matei knew that Plaintiff was older

than forty and admitted that she recognized that Plaintiff was an older individual

during the meeting:

> So, I felt a little bad for her and that's why I
> mentioned to her just as a friendly reminder as being
> friendly, you know, like, well, you older, you know, you
> should be home, not him [(Plaintiff's husband)].
>
> *      *      *
>
> But [I did not mention to Plaintiff that she was older]
> in a bad way, in a way that I think it was – it went to the
> conversation of, well, she was standing, that her knee was
> hurting and that she fell before at home.
>
> And that's when I told her, well, you know, for not
> being careful, imagine if you would fall here, imagine if

you would have slipped here when you was on the fries and the floor was oily, or when you was in the sink doing dishes and there was water all over the place. The step right there, you could go down the steps with your shoes wet and f[a]ll and then what? And I said to her not only you, but somebody else could do that, you know what I mean? . . . . I was just kind of concerned and she knows that.

\*   \*   \*

Not [concerned] because of her age, but because she's a – you know, I come from a Spanish culture where we respect the elderly people. So, I didn't find – maybe ignorance of myself not to express the way it was supposed to be in the right way and maybe I express myself wrong, but I didn't mean to say like because you old, no. You know, you're older, you could get hurt and if you fell, you know what I mean like?

(*Id.* at p. 20 of 40.) Matei adamantly denied telling Plaintiff that her employment was terminated due to Plaintiff's age. (*Id.* at p. 24 of 40.)

At some point, Matei brought the Original EAF to Dorothy Cheung ("Mrs. Cheung") for proofreading. (*See id.* at p. 25 of 40.) After reading the Original EAF, Mrs. Cheung questioned the basis for Matei's inclusion of "age and health" in the explanation, recounting Matei's answer as follows:

[W]e went into detail with [Plaintiff's] poor performance. Then I also asked her how did this age and health issue come up. And [Matei]'s response was that she was actually just talking to [Plaintiff] in a friendly manner, just saying that – I think cultural differences come in here also.

[Matei] comes from a culture where parents and grandparents are actually held in high regard and they are respected for their age and wisdom and what they can offer and they are all part of an extended family. They are all, you know – and so in [Matei]'s mind she's looking at [Plaintiff] in a grandmotherly kind of way and saying that,

> well, [Plaintiff], you know, she was saying that wouldn't
> you like to just take it easy or whatever.
>
> And that's how that age and health issue came about.
> She was just thinking of her as her own grandmother and
> saying that you should just be at home, you know, taking
> care of the cooking and the cleaning and not to worry about
> coming to a fast-food restaurant and trying to, you know,
> work so hard every day.
>
> She was just – it was in a friendly way.  It was
> nothing discriminatory about it.  It was just a friendly
> conversation in which she said [Plaintiff] actually agreed
> with her.

(Doc. 26-4, p. 12 of 36.)  During her deposition, Mrs. Cheung admitted that she was

concerned of Matei's inclusion of Plaintiff's "health and age issue" in the

explanation for termination because "that was not the reason why [Plaintiff] was

terminated."  (*Id.* at p. 14 of 36.)  Mrs. Cheung directed Matei to complete an

Employee Action Form that properly reflected the basis for Matei's terminating

Plaintiff's employment and did not include the language that raised Mrs. Cheung's

concerns.  (*Id.* at pp. 14-15 of 36.)  The revised Employee Action Form ("Revised

EAF"), which was drafted with the assistance of another manager (Doc. 26-3, p. 26

of 40), provided the following explanation for the decision to terminate Plaintiff's

employment:

> [Plaintiff] was terminated for poor performance.  She has
> been counseled on her duties and the timely manner in
> which they must be accomplished. [Plaintiff] was not able
> to complete the tasks correctly, efficiently nor in the
> allotted time allowed to complete the tasks.  Tasks were not
> completed by the end of the shift and [Plaintiff] went home
> anyway.  This is not acceptable[.] Tasks must be done
> before the end of the shift.  Employment is terminated.

(Doc. 26-4, p. 32 of 36.)  Mrs. Cheung directed Matei to dispose of the Original

EAF.  (*Id.* at p. 16 of 36.)  Matei complied and placed the Revised EAF in Plaintiff's

personnel file.  (Doc. 26-3, p. 25 of 40.)  Plaintiff never received a copy of the Revised EAF.  (*Id.* at p. 26 of 40.)

## II.        **Procedural History**

Plaintiff filed a complaint with the United States Equal Employment Opportunity Commission ("EEOC"), which was dual-filed with the Pennsylvania Human Relations Commission ("PHRC").  (Doc. 14, ¶ 6.)  On or around April 10, 2013, the EEOC notified Plaintiff of her right to sue.  (*See id.* at p. 17 of 19.)

Plaintiff initiated this action on June 6, 2013, by filing a two-count complaint alleging that she was subject to discrimination and disparate treatment on the basis of her age and disability when her employment was terminated on April 2, 2012, which she contends was in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621-634 ("ADEA"), and the Americans with Disabilities Act, 42 U.S.C. §§ 12101-12213 ("ADA").  (Doc. 1.)  Defendant filed its answer on July 22, 2013. (Doc. 9.)  Plaintiff's claims filed with the PHRC reached the statutory one-year period on August 27, 2013, and, on September 9, 2013, Plaintiff filed a motion seeking to amend her complaint to include claims arising under state law (Doc. 12), which the court granted (Doc. 13).  Plaintiff's amended complaint was substantially similar to the original complaint and reasserted her ADEA claim at Count I, asserted a claim for age discrimination under the Pennsylvania Human Relations Act, 43 P.S. §§ 951-963 ("PHRA") at Count II, reasserted her ADA claim at Count III, and asserted a claim for disability discrimination under the PHRA at Count IV.  (Doc. 14.)  Defendant filed its answer to Plaintiff's amended complaint on September 23, 2013.  (Doc. 15.)  The parties have engaged in significant discovery pursuant to an amended case management order.  (*See* Docs. 11 & 19.)

On May 19, 2014, Defendant filed the instant motion for summary judgment (Doc. 22), statement of material facts (Doc. 24), and brief in support (Doc. 23).  Defendant argues that Plaintiff cannot establish that she is a protected individual under the ADA or that the legitimate non-discriminatory basis for Defendant's termination of Plaintiff's employment was a pretext.  (*Id.*)  On June 9, 2014, Plaintiff filed a brief in opposition (Doc. 26) and responsive statement of facts (Doc. 27).  Defendant filed a reply brief on June 17, 2014.  (Doc. 28.)  Thus, this matter has been fully briefed and is appropriate for the court's consideration.

**III.**        **Legal Standard**

The court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If the moving party has demonstrated an absence of material fact, the nonmoving party then must "come forward with 'specific facts showing that there is a *genuine issue for trial.*'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.  Essentially, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The court must draw all reasonable inferences in favor of the nonmovant. *Pennsylvania Coal Ass'n v. Babbitt*, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the nonmoving party on that

issue. *Davis v. National R.R. Passenger Corp.*, 733 F. Supp. 2d 474, 485 (D. Del. 2010) (citing *Anderson*, 477 U.S. at 249).  With respect to summary judgment in employment discrimination cases, the court's role is "to determine whether, upon reviewing all the facts and inferences to be drawn therefrom in the light most favorable to the [nonmoving party], there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Id.* (citing *Revis v. Slocomb Indus.*, 814 F. Supp. 1209, 1215 (D. Del 1993)).

**IV.**      **Discussion**

Plaintiff alleges that Defendant discriminated against her based on her age and disability.  Defendant argues that it is entitled to summary judgment on each of Plaintiff's claims, contending that Plaintiff cannot establish that she was disabled as defined by the ADA or terminated for a discriminatory reason rather than her poor performance.  The court will address each argument in turn.

**A.**      **Analytical Framework**

ADA, ADEA, and PHRA claims are litigated according to the burden-shifting framework developed for Title VII claims in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Wilson v. Mobilex USA Inc.*, 406 F. App'x 625, 626 (3d Cir. 2011) ("ADEA . . . claims are governed by the familiar burden-shifting framework set out in *McDonnell Douglas*."); *Smith v. City of Allentown*, 589 F.3d 684, 691 (3d Cir. 2009) (approving of the "continued application of the *McDonnell Douglas* paradigm in age discrimination cases"); *Fasold v. Justice*, 409 F.3d 178, 183-84 (3d Cir. 2005) (holding that ADEA and PHRA claims proceed under the *McDonnell Douglas* framework); *Newman v. GHS Osteopathic Inc.*, 60 F.3d 153, 157 (3d Cir. 1995) (holding that standards for indirectly proving disparate treatment

used in ADEA cases applies in ADA cases).  First, the plaintiff must establish a prima facie case of discrimination.  *Smith*, 589 F.3d at 689.  After doing so, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action.  *Fasold*, 409 F.3d at 184.  If a legitimate nondiscriminatory reason is provided, the plaintiff must present evidence to demonstrate that the defendant's proffered reasons were not its true reasons but were merely a pretext for its illegal action.  *Smith*, 589 F.3d at 690-91.  The plaintiff can prove pretext by submitting evidence that allows a factfinder to either disbelieve the employer's articulated legitimate justification or to conclude that an invidious discriminatory reason was more likely than not a "but for" cause of the employment action.  *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994); *see also Keller v. Orix Credit Alliance Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) (applying *Fuentes* in ADEA context).  To accomplish this, a plaintiff must show that a defendant's reasons are so weak, incoherent, implausible, or inconsistent that they lack credibility.  *See Fuentes*, 32 F.3d at 765.  Regardless of the method, the plaintiff's evidence must allow a reasonable jury to find, by a preponderance of the evidence, that unlawful discrimination was a "but for" cause for the adverse employment action.  *Abels v. DISH Network Serv. LLC*, 507 F. App'x 179, 183 (3d Cir. 2012) (citing *Gross v. FBL Fin. Servs. Inc.*, 557 U.S. 167, 177-78 (2009)).

**B.**     **Discrimination in violation of the ADA and PHRA**[6]

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To establish a prima facie case under the ADA, the plaintiff must demonstrate that: 1) she is disabled within the meaning of the ADA; 2) she was otherwise qualified to perform the essential functions of the job; and 3) has suffered an adverse employment decision as a result of her disability. *Skerski v. Time Warner Cable Co.*, 257 F.3d 273, 278 (3d Cir. 2001). Defendant challenges only whether Plaintiff can establish that she was disabled under the ADA and has conceded, for purposes of summary judgment, that Plaintiff can establish the remaining elements of her prima facie case under the ADA and PHRA. (Doc. 23, p. 16 n.10.)

The protections afforded by the ADA are only applicable to those who are considered disabled under the Act.[7] Thus, the determination of whether the plaintiff has a disability within the meaning of the ADA must be made prior to proceeding with any other element of the claim. Under the ADA, an individual has a disability if he or she: (1) has "a physical or mental impairment that substantially

---

[6] Plaintiff presents disability discrimination claims under the ADA and PHRA. An "analysis of an ADA claim applies equally to a PHRA claim." *Taylor v. Pheonixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). Accordingly, the court only discusses Plaintiff's ADA claim because its analysis of that claim is coterminous with the PHRA claim. *Castellani v. Bucks Cnty. Mun.*, No. 08-3838, 2009 WL 3748548, *4 (3d Cir. Nov. 10, 2009) (stating that courts within the Third Circuit "consider the ADA and PHRA claims simultaneously, because the Acts serve the same goals and are interpreted coextensively").

[7] With the passage of the ADA Amendments Act of 2008 (ADAAA), P.L. 110-325, 122 Stat. 3553, Congress did not change the definition of "disability" but it did expand how "disability" is to be construed, *i.e.*, in favor of broad coverage to the maximum extent permitted by the ADA. 42 U.S.C. § 12102(4)(A). The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability. 29 C.F.R. § 1630.1.

limits one or more of the major life activities of such individual"; (2) has "a record of such an impairment"; or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(1).  Plaintiff contends that she is protected by the ADA because she either has an actual physical impairment or because she is regarded as having such an impairment.  (*See* Doc. 26, p. 12 n.2 (voluntarily withdrawing the "record of a disability" claim).)

### 1.    <u>Actual Disability</u>

The question of whether an individual meets the definition of disability under the ADA should not demand extensive analysis.  29 C.F.R. § 1630.1(c)(4). Under the revised EEOC regulations:

> An impairment is a disability within the meaning of [the ADA] if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population.  An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.  Nonetheless, not every impairment will constitute a disability within the meaning of [the ADA].

29 C.F.R. § 1630.2(j)(1)(ii).  "Merely having an impairment does not make one disabled for purposes of the ADA."  *Trenlenberg v. 21st Century Ins. & Fin. Srvs. Inc.*, Civ. No. 12-cv-3603, 2014 WL 1632237, *3 (E.D. Pa. Apr. 24, 2014) (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002)).  Claimants also need to demonstrate that the impairment limits a major life activity.  *See id.*; *see also Toyota Motor*, 534 U.S. at 195.  "Major life activities" include, but are not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2)(A). To determine whether a plaintiff is "substantially limited" in performing a major life

activity, courts consider: (1) the nature and severity of the impairment; (2) the duration or expected duration of the impairment; and (3) the actual or expected permanent impact of or resulting from the impairment. *Namako v. Acme Mkts. Inc.*, Civ. No. 08-cv-3255, 2010 WL 891144, *4 (E.D. Pa. Mar. 11, 2010) (quoting *Emory v. AstraZeneca Pharms. LP*, 401 F.3d 174, 179-80 (3d Cir. 2005).

Applying these standards, Plaintiff fails to raise a genuine issue of material fact on the issue of whether her impairment substantially limits any of the identified major life activities as of April 2, 2012. *See Bush v. Donahoe*, 964 F. Supp. 2d 401, 417 (W.D. Pa. Aug. 8, 2013) ("[W]ith regard to the 'actual disability' prong, the test is whether, *at the time of the adverse employment action*, the limitation caused by the impairment was 'substantial.'" (emphasis in original)).  In this regard, Defendant argues that "there is simply no evidence on the record that [Plaintiff] suffered from an impairment that substantially limited any major life activity in April 2012."  (Doc. 23, p. 14 of 29.)  Plaintiff responds arguing that "[Plaintiff] has provided testimony that she has been physically unable to bend down on her knees since her knee replacement surgery in 2010," citing to portions of her deposition wherein she testified that she could not traverse steps or physically get on her knees but was able to find alternative methods to complete her tasks.  (Doc. 26, p. 20 of 32.)  The court agrees with Defendant.

In an attempt to force Plaintiff's testimony into the ADA's illustrative list of major life activities, Plaintiff characterizes her inability to traverse steps before and during the few weeks following her November 2010 return as "bending."  This mischaracterizes Plaintiff's testimony.  More importantly, however, Plaintiff overlooks her testimony clearly establishing that any difficulty she experienced with stairs was resolved shortly following her return from recovery.  During her deposition, Plaintiff clearly stated that "[i]t wasn't long after [her return from knee

replacement surgery] that [she] could do the steps too." (Doc. 26-1, p. 31 of 183.) Plaintiff's employment was terminated in April 2012, and nothing in the record tends to establish that Plaintiff continued to experience difficulty going up and down the stairs at the time her employment was terminated.

Furthermore, assuming her testimony reflected the status of her recovery in April 2012, Plaintiff's inability to physically "get on [her] knees" does not qualify as a disability under the ADA and was, in any event, unnecessary for her job. This cursory statement, which was followed by her explanation that she found "other ways" to clean under the tables, certainly fails to establish that this condition substantially impaired a major life activity. Plaintiff relies on *Cohen v. CHLN Inc*, Civ. No. 10-cv-0514, 2011 WL 2713737, *7 (E.D. Pa. July 13, 2011), for the proposition that ongoing pain and limited mobility may render a plaintiff disabled under the ADA. (Doc. 26, p. 20 of 32.) *Cohen* is readily distinguishable from the matter sub judice. In *Cohen*, the plaintiff testified in his deposition that he suffered from debilitating back and leg pain for nearly four months before his termination, which impacted his ability to walk, climb stairs, and sleep. *Id*. Additionally, the plaintiff submitted a letter from his doctor authored two months before his termination, in which the doctor diagnosed the plaintiff with lumbar radiculopathy with spinal and foraminal stenosis and recommended a series of back injections. *Id*. The letter further stated that the plaintiff's pain was aggravated by walking and lying down, and that the plaintiff could only walk ten to twenty yards at a time with the use of a cane before needing to stop and rest, and that the plaintiff found it very difficult to sleep at night in that he was constantly tossing and turning in order to try and find a more comfortable position. *Id*. The plaintiff's testimony indicated that he still struggled with the foregoing issues. *Id*. Based on this evidence, the *Cohen* court

concluded that "a reasonable factfinder could determine that [the plaintiff] had a disability within the meaning of the amended ADA." *Id*. at *8.

Nearly none of this evidence is present in the record here.  Plaintiff's deposition does not provide any basis to conclude that she experienced debilitating pain due to her knee, let alone that she continued to experience such pain at the time of her termination.  Moreover, any pain she experienced did not significantly impact her ability to perform any function necessary for her job, and she explicitly testified that there was no part of her job that she was physically unable to perform.  (Doc. 26-1, p. 66 of 183.)  Unlike the plaintiff in *Cohen*, Plaintiff was able to walk, a specific major life activity set forth in the definition, without restriction and was able to stand throughout her shift.  The court cannot conclude that getting on one's knee is a major life activity.  Based on the record, the court concludes that there are no genuine issues of material fact as to whether Plaintiff was substantially limited in a major life activity in April 2012.  Therefore, Plaintiff lacked a qualifying impairment under the ADA.  Accordingly, Defendant's motion for summary judgment on Plaintiff's ADA claim under the actual disability prong will be granted.

### 2.   **Regarded as disabled**

In addition, a reasonable jury could not find that Defendant discriminated against Plaintiff because it regarded her as being disabled.  To be "disabled" under the "regarded as" prong of the ADA's disability definition, the plaintiff must establish that "he or she has been subjected to an action prohibited under [the ADA] because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." 42 U.S.C. § 12102(3)(A).  Where a plaintiff is "regarded as" disabled, rather than suffering from an actual disability, the perceived impairment must not be transitory and minor, which are those impairments with an expected duration of six months or

less.  42 U.S.C. § 12102(3)(B).  The "regarded as" analysis "focuses not on [the plaintiff] and his actual abilities, but rather on the reactions and perceptions of the persons interacting or working with him." *Kelly v. Drexel Univ.*, 94 F.3d 102, 108-09 (3d Cir. 1996).

In passing the ADA's amendments, Congress made clear that "[it] wanted broad coverage for people with disabilities and people regarded as disabled." 154 Cong. Rec. H8286-03, 2008 WL 4240260 (Sept. 17, 2008).  Congress also made clear that an individual meets the requirement of being "regarded as having such an impairment" if the individual "shows that a prohibited action was taken based on an actual or perceived impairment, *regardless of whether this impairment limits (or is perceived to limit) performance of a major life activity*." *Id.* (emphasis supplied); *see also* 154 Cong. Rec. E1841-03, 2008 WL 4272592 (Sept. 18, 2008) ("[A]n individual who is 'regarded as having such an impairment' under the third prong of the definition is not . . . required to establish that the perceived or actual impairment substantially limits a major life activity.").

Generally, "an employer's perception that an employee cannot perform a wide range of jobs [due to her impairment] suffices to make out a regarded as claim." *Lewis v. Genesis Healthcare Corp.*, 826 F. Supp. 2d 765, 775 (E.D. Pa. 2011) (quoting *Taylor v. Pathmark*, 177 F.3d 180, 188 (3d Cir. 1999)).  However, "the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate . . . that the employer regarded the employee as disabled." *Id.* (quoting *Kelley*, 94 F.3d at 109).  Rather, the ADA's "regarded as" prong is designed to stamp out the stereotyping of and discrimination against persons with impairments in all their forms and provides protection to an individual to whom the employer ascribes an inability to perform the functions of a job because of a medical condition when, in fact, the individual is perfectly able to meet the job's duties.

21

Defendant argues that there is no evidence that Defendant perceived or treated Plaintiff as "actually being limited in a substantial life activity."[8]  (Doc. 23, p. 16 of 29.)  Plaintiff argues that Defendant was aware that Plaintiff suffered from arthritis and diabetes and that Plaintiff was unable to bend down on her knees.  (Doc. 26, pp. 21-23 of 32.)  Relying on *Rubano v. Farrell Area School District*, 991 F. Supp. 2d 678, 693 (W.D. Pa. 2014), Plaintiff contends that "all that an ADA plaintiff must show to raise a genuine issue of material fact for the 'regarded as' prong is that a supervisor knew of the purported disability" and that the record demonstrates that "her supervisor knew of her purported disability."  (Doc. 26, p. 24 of 32.)  The court rejects Plaintiff's position.

In *Rubano*, the court determined that the school district employee's depression constituted a "mental impairment" that was neither transitory nor minor under the ADA based upon the plaintiff's documented history of depression that necessitated two FMLA leaves for clinical and pharmaceutical treatment.  991 F. Supp. 2d at 692.  The district court found that, when viewing the evidence in the light most favorable to the plaintiff, the plaintiff raised a genuine issue of material fact as to whether he was subjected to any of the alleged prohibited actions because of his mental impairment.  *Id*. at 692-93.

The *Rubano* court rejected case law predating the amendments to the ADA as applying too stringent of a standard for "regarded as" disability and held that the employer's knowledge of an employee's impairment is sufficient to survive summary judgment.  *Id*. at 693 (citing *Mengel v. Reading Eagle Co.*, Civ. No. 11-cv-6151, 2013 WL 1285477, *4 (E.D. Pa. Mar. 29, 2013)).  The *Rubano* court also rejected as too restrictive the Third Circuit's requirement in *Kelly*, a pre-ADAAA

---

[8]  After the passage of the ADAAA, an employer no longer has to regard the plaintiff as having an impairment that substantially limits a major life activity.

case, that an ADA plaintiff must produce more than simply the employer's awareness of the plaintiff's impairment, and held that a plaintiff is "regarded as" disabled simply because the employer had knowledge of the impairment. *See id.* at 693. This standard is far too lenient. Indeed, the statute requires the court to determine whether the plaintiff was "subjected to an action prohibited" by the ADA "because of an actual or perceived" impairment. 42 U.S.C. § 12102(3)(A). While this may require the plaintiff to show that the defendant knew of, or at least believed the plaintiff suffered from, his or her impairment, such a showing is insufficient by itself to establish that the plaintiff is "regarded as" disabled. Allowing such a showing to establish a prima facie case for "regarded as" disability would permit any employee to become protected by the ADA by simply announcing to his or her supervisor that he or she has an impairment. While the ADAAA sought to ensure disabled persons were protected from discrimination, it did not seek to open the floodgates to any person who suffered from a non-temporary or non-minor impairment if the employer did not discriminate against the employee because of the impairment.

Plaintiff contends that she has established a prima facie case under the ADAAA based on her showing that her supervisor knew of her purported disability. Whatmore testified that he was generally aware that Plaintiff suffered from health issues, including "ha[ving] a leg problem" and "diabetes." (Doc. 26-2, p. 24 of 46.) In the Original EAF, Matei stated that "because of her . . . health essue [sic] [Plaintiff] cant [sic] perform that job 100% anymore" and that "[Plaintiff] cant [sic] keep up anymore." (Doc. 26-3, p. 38 of 40.) Plaintiff argues that this demonstrates Plaintiff was regarded by Defendant as having a disability. However, absent from the record is any indication that Defendant subjected Plaintiff to a prohibited action because of her actual or perceived impairment. Indeed, because of Plaintiff's failure

to adequately perform her duties on night shift, Plaintiff was moved to the day shift, which had more support from additional crew members and was subject to Matei's direct supervision (Doc. 26-3, pp. 14-15, 17 of 40.) Furthermore, Plaintiff's substandard performance was verbally corrected and Matei provided Plaintiff with verbal warnings and instructions regarding methods to remedy Plaintiff's shortcomings concerning her preparation of certain items (Doc. 26-1, pp. 81, 84 of 183). During her deposition, Plaintiff admitted that she was not achieving the performance levels set by Matei and that Matei did not fabricate any issues with her performance (*Id.* at pp. 84-85 of 183). Plaintiff has not adduced any evidence indicating that Defendant regarded her as disabled because she has not demonstrated that Defendant ascribed to her an inability to perform the functions of her job because of her medical conditions. While there is evidence that at least one supervisor was aware of Plaintiff's "leg problem," there is no evidence that anyone perceived that Plaintiff's musculoskeletal condition prevented her from doing her job. Although Plaintiff testified that she could not "get on [her] knee" (*Id.* at p. 105 of 183), she presented no evidence that Defendant regarded her as disabled and failed to adduce sufficient evidence tending to show that her employment was terminated based on an actual or perceived impairment. Additionally, Matei's inclusion of the word "health" in the Original EAF falls far short from establishing Plaintiff was regarded as disabled. Stray remarks from a co-worker, even those implicating a possible impairment, alone are insufficient to raise the critical inference that Plaintiff was regarded as disabled. *See Cunningham v. Novo Nordisk*, Civ. No. 12-cv-6654, 2014 WL 1318390, *7 (E.D. Pa. Apr. 1, 2014); *see also Parker v. Port Auth. of Allegheny Cnty.*, 90 F. App'x 600, 603-04 (3d Cir. 2004) (holding that statement by an agent of defendant that the plaintiff "couldn't handle the stress that goes along with the job" did not provide a reasonable inference that the defendant regarded the

plaintiff as disabled). Accordingly, Defendant's motion for summary judgment on Plaintiff's ADA claim under the "regarded as" prong will be granted.

## C.    Discrimination in violation of the ADEA and PHRA

The Age Discrimination in Employment Act ("ADEA") makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1).  The Pennsylvania Human Relations Act ("PHRA") provides that it is "an unlawful discriminatory practice . . . [f]or any employer because of the . . . age . . . of any individual . . . to otherwise discriminat[e] against such individual . . . with respect to compensation, hire, tenure . . . if the individual . . . is the best able and most competent to perform the services required." 43 P.S. § 955(a).  To prevail on a claim of intentional discrimination under either the ADEA or the PHRA, "a plaintiff must show that his or her age 'actually motivated' or 'had a determinative influence on' the employer's adverse employment decision." *Fasold*, 409 F.3d at 183.

To establish her prima facie case of age discrimination under the ADEA, a plaintiff must satisfy four elements: (1) she is at least forty years of age; (2) she is qualified for the position in question; (3) she has suffered an adverse employment action; and (4) she has been replaced by a sufficiently younger employee to permit a reasonable inference of age discrimination.  *See Mahler v. Community Coll. of Beaver Cnty.*, Civ. No. 11-cv-1610, 2014 WL 4188073, *10 (W.D. Pa. Aug. 22, 2014); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995).  The court accepts Defendant's concession that Plaintiff has established a prima facie case of age discrimination for purposes of summary judgment.  Thus, the analysis shifts to the next step.

Here, Defendant's proffered justification for terminating Plaintiff is her poor performance.  Defendant contends that Plaintiff cannot meet her burden at step three of proving that this proffered reason was merely a pretext for unlawful age discrimination.  In particular, Defendant insists that the Original EAF is irrelevant and has been taken out of context and that any age-related language made by Matei has been taken out of context and does not help Plaintiff establish pretext.

The court, however, finds that the record is adequate to support a finding by a reasonable factfinder that Defendant's proffered explanation is pretextual.  Defendant's argument rests in large part upon Plaintiff's admissions that she failed to meet Matei's standards.  However, while Plaintiff admitted that she could not specifically point to an instance when Matei fabricated an issue with her performance, she does dispute the accuracy of her performance evaluation and testified that her job responsibilities did not concern two of the three areas on her most recent evaluation in which she received a below standards rating, namely accuracy of orders and work service.  (Doc. 26-1, pp. 68-69 of 183.)  Furthermore, Plaintiff testified that Matei nitpicked on her performance (*see, e.g.*, *id.* at pp. 57, 74, 76 of 183) and gave Plaintiff inconsistent direction (*see id.* at pp. 73-74 of 183). Additionally, although Plaintiff cannot discredit an otherwise legitimate reason for the adverse employment action by simply showing that the employer's decision was wrong or mistaken, *see Fuentes*, 32 F.3d at 764, the severity of the sanction may be circumstantial evidence of a pretext when viewed in the light most favorable to Plaintiff and in conjunction with the more direct evidence of discrimination.

The record contains evidence, albeit in the nature of Plaintiff's uncorroborated testimony, that a "hit list" existed outlining individuals whom Matei was to "get rid of." (Doc. 26-1, p. 55 of 183.)  Each of the individuals listed on the alleged hit list were over fifty years old.  (*Id.* at p. 58 of 183.)  The majority of those

26

people, one of whom was Plaintiff, were no longer employed by Defendant at the time of Plaintiff's deposition, including Joyce, who "[Matei] had [made] so upset that she quit," Ester, who "[Matei] was after . . . to retire," an individual named Susie, and an unidentified individual whom "finally quit because of [Matei] harassing her." (*Id.* at p. 56 of 183). A reasonable jury could conclude that the "nitpicking" Plaintiff endured at the hands of Matei was a means to getting Plaintiff to quit, similar to the scenario that caused the unidentified older employee to quit. (*See id.* ("There was another one working on french fries. . . . She finally quit because of [Matei] harassing her. It's like she just got on top of you.").) While the court would not be surprised if Plaintiff's allegation in this regard is untenable, it may provide a lens through which a reasonable jury could view Plaintiff's termination and conclude that the legitimate reason offered by Defendant is a pretext for a discriminatory motive.[9] At the very least, when viewing the evidence in the light most favorable to Plaintiff as the court must do at this stage of the litigation, it raises a genuine issue of material fact regarding whether Plaintiff was terminated because of her age.

This conclusion is only amplified by the conversation between Matei and Plaintiff during the April 2, 2012 meeting and language included in the Original EAF. During the April 2, 2012 meeting, Matei stated to Plaintiff that "[she is] older [and] . . . should be home" (Doc. 26-3, p. 20 of 40) and compared Plaintiff to her grandmother (Doc. 26-2, p. 18 of 46; *see also* Doc. 26-1, p. 102 of 183). Following

---

[9] This is not to say that Matei terminated Plaintiff because she disliked older individuals working at the restaurant. To the contrary, the court has no reason to reject Matei's testimony that she comes from a Spanish culture that respects the elderly. (Doc. 26-3, p. 20 of 40.) Nevertheless, it is still discriminatory if Matei terminated Plaintiff because she believed Plaintiff, as an older person, should be staying home and laughing rather than working. Notwithstanding the noble intentions expressed by Matei in this regard, it may still permit a jury to find that Plaintiff suffered an adverse employment action because of her age.

the termination meeting, Matei explained in the Original EAF that the basis for her terminating Plaintiff's employment was "because of [Plaintiff's] age and health essue [sic] she cant [sic] perform that job with 100% anymore." (Doc. 26-3, p. 38 of 40.) While the court stops far short of reading this language as "expressly admit[ting] . . . that the real reason [Plaintiff] was terminated was because of her age and health issues and not for her poor performance" (Doc. 26, p. 29 of 32), it does recognize that it may create a reasonable basis for a factfinder to reject Defendant's proffered legitimate reason for terminating Plaintiff's employment.

Viewing the evidence in the light most favorable to Plaintiff, there is a genuine issue of material fact as to whether Defendant's proffered justification for terminating Plaintiff's employment was a pretext. Accordingly, Defendant's motion for summary judgment regarding Plaintiff's claim under the ADEA must be denied.

**V.        Conclusion**

In this matter, the evidence and inferences derivable therefrom, when viewed in the light most favorable to Plaintiff, create a genuine issue regarding whether Defendant's proffered legitimate reason for terminating Plaintiff's employment was a pretext and that Plaintiff was actually terminated due to her age. Accordingly, Defendants are not entitled to judgment on the issue of liability on Plaintiff's ADEA claim, and the motion for summary judgment must be denied in that regard. However, even when viewed in the light most favorable to Plaintiff, the evidence does not establish that Plaintiff suffered from an actual impairment that substantially limited a major life activity at the time of the adverse employment decision or that Defendant ascribed to her an inability to perform the functions of her job because of her medical conditions. For these reasons, Defendant has not established that she was actually or regarded as disabled under the ADA.

Accordingly, Defendant is entitled to judgment on Plaintiff's claim under the ADA and corresponding claim for disability discrimination under the PHRA.

An appropriate order will issue.

s/Sylvia H. Rambo
United States District Judge

Dated:  September 9, 2014.